EXHIBIT B

# WILENTZ

## WILENTZ, GOLDMAN & SPITZER P.A.

**ATTORNEYS AT LAW**

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000
Fax 732.855.6117

Meridian Center I
Two Industrial Way West
Eatontown, NJ 07724-2265
732.542.4500
Fax 732.493.8387

110 William Street
26th Floor
New York, NY 10038-3927
212.267.3091
Fax 212.267.3828

Two Penn Center Plaza
Suite 910
Philadelphia, PA 19102
215.940.4000
Fax 215.636.3999

www.wilentz.com

Please reply to:
Woodbridge
Direct Dial: (732) 855-6462
Direct Fax: (732) 726-6606

December 9, 2011

VIA OVERNIGHT MAIL AND
VIA FACSIMILE 212-623-6168
JPMorgan Chase Bank, N.A.
Escrow Services
4 New York Plaza, 21st Floor
New York, NY 10004
Attention: Chris Palermo/Donna Fitzsimmons

VIA OVERNIGHT MAIL AND
VIA CERTIFIED MAIL RRR
Harsh Chadha
Ascendere, Inc.
P.O. Box 6366
Lawrenceville, NJ 08648

Re: **CLAIM NOTICE**
ESCROW AGREEMENT dated March 14, 2011, by and among Ascendere, Inc, a New Jersey corporation ("Seller"), Bright Horizons Children's Centers LLC, a Delaware limited liability company ("Buyer"), and JPMorgan Chase, NA as escrow agent ("Escrow Agent")

To the above addressed parties:

This firm represents Bright Horizons Children's Centers LLC. Pursuant to Section 3(c) of the above referenced agreement, please find the attached Claim. Subject to no Response Notice from the Seller within 30 days, the Escrow Agent is hereby directed to wire **$424,018.18** from the Fund to the wire instructions of Buyer as follows:

> Acct name: Bright Horizons Children's Center
> Bank name: JP Morgan Chase Bank, NY, NY
> ABA: 021000021
> Acct#: 304163422

Very truly yours,

TODD E. LEHDER

Enclosures
cc: Mark D. Shapiro, Esq. w/enclosures (by overnight mail)
Peter J. Boyer, Esq., w/enclosures (by overnight mail)
Antonette S. Fernandez, Esq., w/enclosure (by overnight mail)

#3433013



Seller and Buyer are parties to a certain Asset Purchase Agreement dated on or about March 14, 2011 ("Agreement"). Capitalized terms used herein shall have the meanings as set forth in the Agreement.

Buyer asserts a Claim against the Escrow Fund in the amount of **$424,018.18** to satisfy required reimbursements and as a result of Losses incurred by Buyer arising out of, resulting from, caused or attributed to acts or omissions by Seller and violations of the representations and warranties of Seller in the Agreement.

## Basis for Claims

Seller represented, warranted and agreed, as of the date of the Agreement and the Closing Date, as follows:

Pursuant to **Section 2.13** of the Agreement:

> *"The operation of the Centers and the Business is ………..in accordance with the material requirements of all governmental authorities having jurisdiction thereof."*

Pursuant to **Section 2.14** of the Agreement:

> *"…[E]ach of the premises leased or owned by such Seller having been and now are being used and operated, in material compliance with all statutes, regulations, orders, covenants, restrictions, and plans of federal, state, regional, county, or municipal authorities, agencies, or boards applicable to same."*

Pursuant to **Section 2.16** of the Agreement:

> *". . . Except as set forth on Schedule 2.16, all improvements and fixtures on real properties leased by Sellers conform in all material respects to all applicable health, fire, safety, environmental, zoning and building laws and ordinances. . . .All materials, buildings, structures and fixtures used by Sellers in the conduct of its business are in good working condition and repair, ordinary wear and tear excepted, free of mold and the presence of any harmful conditions or substances and are sufficient for the type and magnitude of their respective operations."*

Pursuant to **Section 2.17** of the Agreement:

> *"All the machinery, equipment and other tangible personal property of Sellers are in good working condition and repair, ordinary wear and tear excepted, and are sufficient for the type and magnitude of their operations as currently conducted."*

Pursuant to **Section 2.20(a)** of the Agreement: , as follows:

> *"Except as set forth on Schedule 2.20(a), all real property owned, leased, used or by any means controlled by any Seller is free from any hazardous substance, mold, asbestos, radon, polychlorinated biphenyls ("PCBs"), petroleum product, or waste (including crude oil or any fraction thereof), natural gas, liquefied gas, synthetic gas or other material defined, regulated, controlled, or potentially subject to any remediation requirement under any environmental law (collectively, "Hazardous Materials") . .*
> *"*

Pursuant to **Section 2.20(b)** of the Agreement:

> *"Each Seller is in compliance with all federal, state, and local laws, ordinances, rules, regulations, and other governmental requirements relating to pollution, control of chemicals,*

*management of waste, discharges of materials into the environment, mold, health, safety, natural resources, and the environment..."*

Pursuant to **Section 2.20(c)** of the Agreement:

*"Each Seller has, and is in compliance with, all licenses, permits, registrations, and government authorizations necessary to operate the Business under all applicable Environmental Laws."*

Pursuant to **Section 2.29** of the Agreement:

*"All of the information provided by the Sellers, Stockholders and their representatives herein or in the Schedules are true, correct, and complete in all material respects, and no representation, warranty, or statement made by the Sellers or Stockholders in or pursuant to this Agreement or the Schedules contain or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make such representation, warranty, or statement not misleading."*

Seller covenanted, as of the date of the Agreement and the Closing Date, as follows:

Pursuant to **Section 4.3** of the Agreement:

*"At all times prior to the Closing, Sellers shall promptly notify Buyer in writing of the occurrence of any event which will result, or has a reasonable prospect of resulting, in the failure to satisfy any of the conditions specified in Article 5."*

Pursuant to **Section 4.10** of the Agreement:

*"Subject to <u>Section 8.11</u> below, Sellers will make (a) all normal and customary repairs, replacements, and improvements to their facilities (including the Centers), properties, and equipment, including the repairs set forth on <u>Schedule 4.10</u> (the "Pre-Closing Repairs"), between the date hereof and continuing until the Closing and (b) those repairs required by the State of New Jersey (or any local governmental body at the direction of the State of New Jersey in connection with the licensing process) in order that the licenses required for Buyer's ongoing operation of the Centers may be issued and/or renewed up to the date that is nine months following Closing, other than those repairs required as a result of a change in law or regulations effective after the date of this Agreement (the "Licensing-Required Repairs")."*

The Agreement requires the Seller to indemnify the Buyer as follows:

Pursuant to **Section 7.4** of the Agreement:

*"Sellers and the Stockholders, jointly and severally, hereby agree to defend, indemnify and hold harmless Buyer, BFAM and their affiliates and each of their officers, directors, stockholders, employees, agents, successors and assigns ....for any and all liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties, whether accrued, absolute, contingent or otherwise (including, without limitation, reasonable accounting fees, legal costs and expenses (such as attorneys' fees, discovery costs, expert fees and court costs), and interest on the amount of any loss from the date suffered or incurred) (a "Loss") arising out of, resulting from, caused by or attributed to any act or omission by Sellers or the Stockholders on or prior to the Closing Date and any other Loss arising out of, resulting from, caused by or attributable to:*

> (a) any inaccurate representation or misrepresentation in or breach of any of the representations or warranties made by, or covenants or agreements of, Sellers or the Stockholders contained in this Agreement, including any exhibits or Schedules attached hereto;
>
> (b) the matters listed in Schedule 2.15, Schedule 2.20 or Schedule 2.28...."

Pursuant to **Section 7.6** of the Agreement:

> "Subject to Section 7.8, the Indemnifying Party...shall have no obligation to indemnify the Indemnified Parties...pursuant to Section 7.4(a)-(d), 7.4(f) or 7.5, as applicable, unless and until the aggregate Losses incurred or sustained by the Indemnified Parties exceeds (a) in the case of Losses arising out of the Seller Specified Representations, the Disclosed Matters and Section 3.2 ...., $10,000, after which the Indemnifying Party will have indemnification liability for the total amount of all Losses, including the Losses below $10,000, and (b) in all other cases, $100,000 (with Losses arising out of the Seller Specified Representations, the Disclosed Matters and Section 3.2 (Authorization, Validity and Effect of Agreements) counting towards such $100,000 threshold), after which the Indemnifying Party will have indemnification liability for the total amount of all Losses, including Losses below $100,000."

The Agreement requires the Seller to pay expenses of the Buyer as follows:

Pursuant to **Section 8.11** of the Agreement:

> "....Sellers and the Stockholders, jointly and severally, shall be responsible for all expenses incurred (a) for the Pre-Closing Repairs, (b) for the Licensing-Required Repairs, (c) relating to the assignment of contracts, including but not limited to any Real Property Leases, and vehicles to Buyer, (d) for repairs necessary for Buyer to receive a continuing certificate of occupancy in the name of Buyer of its affiliates for the Center located at 410 Main Street, Spotswood, New Jersey, and (e) to fix the sinkhole at the Lopatcong Center to the extent it reappears on or before the date that is two years from the date of Closing, and (f) relating to all legal fees incurred by Buyer relative to creating and entering into the Mortgage and the Mortgage Promissory Note for the Hillsborough Property in an amount not to exceed $10,000.00. Notwithstanding the foregoing, Sellers and the Stockholders (x) shall have no liability for Licensing-Required Repairs (other than Pre-Closing Repairs) at a Center unless and until the aggregate liability for such repairs at such Center exceeds $1,500, after which they will be responsible for the total amount of such repairs, including amounts below $1,500, and (y) shall have a maximum liability for Licensing-Required Repairs (other than Pre-Closing Repairs) at each Center of $40,000."

Buyer acknowledges some Claims for Losses and reimbursements for costs incurred by Buyer pursuant to the Agreement are subject to Monetary Limitations as set forth at Sections 7.6 and 8.11 of the Agreement and affirms the within Claims exceed the thresholds established therein and asserts the Seller's obligation to indemnify and reimburse the Buyer to the full extent of the Monetary Limitations set forth in the Agreement.

## Description of Losses

### I. Deficiencies at East Hanover

#### a) Water and mold

The contents of a letter from Stephen Dreier to Harsh and Sonia Chadha Esq. dated September 12, 2011, attached here are incorporated by reference. As noted, Seller breached the <u>Sections 2.16</u> and <u>Section 2.20</u> warranties since the property was not in good operating condition, nor was it free of mold. We understand from on-site staff that for at least two years prior to the Closing, the property regularly took on water, and rather than undertake steps necessary to solve the water issues or the diligence necessary to determine the extent of the damage or mold at the premises, these conditions were ignored. The photographs already provided to the Seller show rusted areas concealed under cosmetic repairs made during Seller's ownership.

Buyer has taken steps to investigate and remediate the mold condition. The mold remediation expenses total $109,490.42.

In addition to the aforementioned mold issues, Buyer has taken the remedial steps to solve the water infiltration, including installation of an underground drain and sump pump to repair these deficiencies and to render the property in good working condition. These repairs total $17,594.01. Work to install a fence around the sump pump remains to be completed at a projected cost of $1,100,00, for a total of $18,694.01.

A total amount of $128,184.43 is being claimed in relation to the aforementioned issues at East Hanover. The tipping basket has been exceeded, and as a result, the entire amount is compensable under the Agreement. Annexed hereto is documentation verifying the Losses of Buyer related to this deficiency.

#### b) Surfacing

The playground failed the licensing inspection for a variety of reasons related to both the surfacing and the equipment[1] and is the obligation of the Seller pursuant to the covenant set forth at <u>Section 4.10</u> of the Agreement. This, along with objective observations of the surfacing condition, led to the obvious conclusion that it required replacement. In addition to the worn and non-resilient nature of the existing surfacing, Licensing required removal of non-compliant equipment that was "staked" into the surfacing exposing more holes and tripping hazards in the existing surfacing.

The cost of demolition and re-grading the playground for the installation of new surfacing was $25,679. Annexed hereto is documentation verifying the Losses of Buyer related to this deficiency. This claim falls outside of any basket and is fully compensable.

---

[1] "163. Provide and maintain play equipment to meet public playground design standards ASTM F-1487), as specified by the Consumer Product Safety Commission (CPSC)."
  "- Provide certification on all climbing equipment or remove"

"166. Provide and maintain resilient surfacing (ASTMF -1292) and use zones under all play equipment that subjects children to a fall as specified by CPSC.
  "a) Provide documentation on Perma-grass to ensure appropriate resiliency
  b) Repair or replace Perma-Grass where torn
  c) Ensure at least 6' use zone around all climbing equipment; 2) Relocate or remove spinner in small playyard."

"179. Take necessary action to remove outdoor hazards."

c)   Playground equipment and other Licensing Deficiencies

As indicated on the attached licensing report, Licensing requires the Center to both provide and maintain equipment which meets appropriate standards, or it was required to be removed. The costs associated therewith are Seller's obligation pursuant to Section 2.17 and Section 4.10 of the Agreement.

Attached is an overview of the 3 playgrounds. All five of the climbing structures did not meet licensing's standards for a variety of reasons and required removal. None were or could be certified. Most were of residential, not commercial, grade and did not conform with the applicable regulations. There were inadequate fall zones and resilient surfacing in the fall zones to support these and other play structures. The large preschool playground climbing structure was cemented into the ground, so even if a certification could have been obtained, it could not be moved to achieve a compliant fall zone.

The offending structures constitute nearly all of the available equipment at the site, and suitable replacements meeting licensing guidelines were required.

The cost of replacement, compliant equipment totaled $55,053.67. The cost of resolving the other licensing deficiencies noted in the licensing report was $4,396.38, for a total of $59,450.05. Annexed hereto is documentation verifying the Losses of Buyer related to this deficiency. These claims are subject to the $40,000.00 cap so a claim in the full amount of the cap is made.

## II.   Deficiencies at Lopatcong

a)   Repair of sinkholes

Seller is obligated under Section 8.11 of the Agreement to permanently fix the sinkhole problem at the Lopatcong Center. Attached is an overview from Langan Engineering ("Langan") which outlines the recommended process of investigation, remediation and prevention. Langan's professional opinion is that the cause of the sinkhole formation is the underlain carbonate rock belonging to the Allentown Dolomite formation. In light of the known geological conditions that make this area prone to sinkhole formation exactly like what has been experienced at the Lopatcong facility, a failure to properly correct the sunken areas makes it highly likely that they will reoccur. Furthermore, considering the proximity of the building to the sinkhole condition and the elevation of the building relative to the bottom of the stormwater basin, if the situation is not permanently remedied, the risk of significant collateral damage to the structure exists.

It is acknowledged that the Seller has conducted work at the site to fill existing sinkholes; however, the work was not consistent with the Langan Engineering method designed to permanently remediate the situation.[2] Since Seller's obligation is to provide a permanent solution to the sinkhole problem and the full extent of the necessary work can only be estimated without extensive invasive investigation, Buyer asserts a claim for potential future losses associated with the sinkholes in the amount of the attached estimate from Langan for investigation, remediation and prevention in the amount of $63,000.

b)   Site safety related to sinkholes

The history of the sinkholes reveals an unpredictable and progressive pattern of ground subsidence that compromises site safety. This unacceptable safety condition is the obligation of the Seller under Section 8.11.

---

[2] Buyer has consulted with the Township Engineer who is familiar with the problem experienced at the site and he recommends a method that is consistent with that proposed by Langan Engineering which includes grouting to fill existing cavities in the rock.

The temporary nature of the repair methods used to date does not sufficiently reduce the risk associated with future sinkholes. As a routine inspection procedure would be costly, inconvenient and disruptive to the Buyer's operation, Buyer proposes to install a fence around the area presently known to be prone to sinkholes in order to minimize the danger to visitors and employees at the site. This claim is directly related to the Seller's failure to properly and permanently stabilize the site from the reoccurring sinkhole problem. The estimated cost of installing the fence is $13,000.00 and a claim is made for the full amount of the estimate.

### III.  Deficiencies at Branchburg

It has been discovered by the Buyer that this facility was not in good working and operating condition required by the warranties provided at Sections 2.16 and Section 2.20 of the Agreement due to water infiltration through the foundation into the subsurface basement area. Required repairs have included the installation of a sump pump and the installation of an awning to keep water away from the foundation to prevent future infiltration. Expenditures on repairs to date have totaled $5,815.25. Annexed hereto is documentation verifying the Losses of Buyer related to this deficiency.

### IV.  Deficiencies at Bridgewater

It has been discovered by the Buyer that this facility was not in good working and operating condition required by the warranties provided at Sections 2.16 and Section 2.20 of the Agreement due to water infiltration through the foundation into the subsurface basement area. Required repairs achieved to date by Bright Horizons include the installation of a sump pump, electrical repairs, and the installation of an awning to keep water away from the foundation to prevent future infiltration and total $6,671.50.

Although it appears that Seller is contemplating repairs to the cracked foundation and/or repairs to subsurface piping, it is not clear what has or will be accomplished. Expenditures on necessary repairs to repair, seal the foundation and to install a subslab drainage system and sump pit and pump have not yet been completed will total $86,650.00. Annexed hereto is available documentation verifying the Losses of Buyer related to this deficiency.

### V.  Legal fees incurred by Buyer

a)  Legal fees incurred by Buyer relative to creating and entering into the Mortgage and the Mortgage Promissory Note for the Hillsborough Property in an amount not to exceed $10,000.00.

Buyer incurred legal fees associated with the preparation of the aforementioned documentation, including recording charges and reimbursable costs, in the amount of $10,101.76. Annexed hereto is documentation verifying the legal expenses. This claims are subject to the $10,000.00 cap, so a claim in the full amount of the cap is made.

b)  Legal fees and expenses incurred by Buyer related to the Losses and in the pursuit of reimbursement of the Losses.

Buyer has incurred, and continues to incur, legal fees associated with the Losses and the pursuit of reimbursement. Said costs are the obligation of the Seller pursuant to Section 7.4 of the Agreement. Buyer claims losses in the approximate amount of $20,000 and reserves the right to supplement this claim for legal costs and fees until such time as the final settlement of the claim. Documentation verifying the total legal fees that are subject to reimbursement shall be provided upon final settlement of the claim.

## VI. <u>Interest on Losses incurred by Buyer</u>

Buyer is entitled to reimbursement for interest on the amount of any Loss from the date suffered or incurred pursuant to <u>Section 7.4</u> of the Agreement. Buyer claims Losses for interest incurred in an unspecified amount to be calculated upon final settlement.. For the purposes of this claim, interest expenses are estimated to be approximately $25,000.00 and Buyer reserves the right to supplement this claim for all interest accrued on Losses through the date of the final settlement of the claim. Documentation verifying the calculation of interest on all Losses shall be provided in conjunction with the final settlement of the claim.

## Index of Attachments

I. **Deficiencies at East Hanover**

    Letter from Stephen Dreier to Harsh and Sonia Chadha Esq. dated 9/12/11
    Belfor Invoice dated October 18, 2011 and supporting documentation
    Salem Environmental Report dated September 1, 2011
    Salem Environmental Report dated September 12, 2011
    Allied Carpet proposal dated June 9, 2011
    Salem Environmental Invoice dated 9/12/11 and BrightHorizons Purchase Order dated 9/27/11
    CJA Services Invoice dated 10/20/11
    M.O. Cleaning Services LLC Invoice dated September 2011
    Allied Carpet invoice dated 9/29/11 and BrightHorizons Purchase Order dated 10/24/11
    R&R Associates, LLC proposal dated 9/1/11 and BrightHorizons Purchase Order dated 10/21/11
    State of New Jersey, Department of Children and Families, Office of Licensing, Inspection/Violation Report dated 4/4/11
    Consumer Products Safety Commission-Based Playground Audit dated May 2011
    Corby Associates Inc., review of facilities, recommendations dated April 27, 2011
    Corby Associates Inc.
    Corby Associates Invoice dated 7/27/11 and BrightHorizons Purchase Order dated 10/3/11
    General Recreation, Inc., sales order dated 8/23/11 and BrightHorizons Purchase Order dated 9/9/11
    R&R Associates, LLC invoice dated 10/3/11 and BrightHorizons Purchase Order dated 10/21/11
    Rendering from Landscape Structures of equipment installed

II. **Deficiencies at Lopatcong**

    Langan proposal for geotechnical services dated 10/21/11
    Langan Memo including recommendations and cost estimates dated 11/10/11

III. **Deficiencies at Branchburg**

    USM invoice dated 11/18/11
    Action Contracting LLC invoice dated 10/21/11

IV. **Deficiencies at Bridgewater**

    Email proposal from Langan dated 12/2/11
    Action Contracting LLC proposal dated 9/8/11
    USM invoice dated 10/5/11
    Action Contracting LLC invoice dated 10/21/11

V. **Legal fees incurred by Buyer**

    Wilentz, Goldman & Spitzer, P.A. Invoice dated March 31, 2011